**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-20-00247-CV**
**IN THE INTEREST OF C.F.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-236,500**

## MEMORANDUM OPINION

After a bench trial, Appellant E.F. ("Erica") appeals the Order of Termination terminating her parental rights to her daughter C.F ("Cindy").[1] The trial court also terminated the parental rights of father, N.W. ("Nathan"), to his daughter Cindy.[2] We affirm the trial court's judgment.

---

[1] To protect the identity of the minor, we use the pseudonyms to refer to the child, parents, and family members. *See* Tex. R. App. P. 9.8(b)(2).

[2] Nathan is not a party to this appeal, and we include limited details about him only as necessary to explain the facts.

Background

On December 11, 2019, the Department of Family and Protective Services ("Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The petition named one-month-old Cindy as the subject of the suit, Erica as the child's mother, and Nathan as the child's father.

The petition was supported by an affidavit by a Child Protective Services (CPS) worker and representative of the Department. According to the affidavit, on December 10, 2019, the Department received a report of neglectful supervision of one-month-old Cindy by her mother Erica. According to the report, Erica was observed at Christus St. Elizabeth Hospital in a lethargic state and medical staff reported her to be "slipping in and out of consciousness." The affidavit states that Erica had reported to medical staff that she had used synthetic marijuana prior to her admission to the hospital, and the medical staff observed her breastfeeding Cindy "which raised the concern of potential drug exposure to the child." According to the affidavit, Erica allowed Cindy to leave the hospital with a family friend who medical staff suspected of using drugs.

The affidavit explained that the Department representative met with Erica and Erica's mother at the hospital's emergency room on December 11, 2019 regarding the report of Erica's neglectful supervision of Cindy. According to the Department

representative's affidavit, Erica would not respond to her questions about why Erica was admitted and if she had used synthetic marijuana prior to her admission to the hospital. The Department representative stated in her affidavit that Erica was unable to develop a plan of safety for Cindy, that Erica was unable to confirm the identity and location of Cindy's father, that Erica's mother could not serve as a placement option for Cindy because of her employment obligations, and Erica's mother provided the Department representative with the contact information for the family friend with which Cindy was staying.

According to the affidavit, when the Department representative contacted the family friend, she reported transporting Erica and Cindy to their doctor's appointments on the morning of December 10, 2019, that Erica became "very quiet[,]" was "observed nodding off[,]" and "remained in a lethargic state during her doctor's appointment and [Cindy]'s pediatric doctor appointment." Upon the suggestion of a doctor who thought Erica was suffering from a stroke, the family friend took Erica to the hospital. The family friend stayed with Erica and Cindy at the hospital for a few hours and then took Cindy home with her once Erica's mother arrived.

The Department representative stated in the affidavit that the family friend could not serve as Cindy's caregiver because she could not pass the background check. Because Erica could not develop a safety plan for Cindy, no other caregivers

were identified for Cindy, and Cindy's father's whereabouts were unknown, an emergency removal was necessary.

According to the affidavit, Erica and Nathan both have validated history with the Department. In May 2018, Erica and Nathan both received validations for neglectful supervision of Erica's older son, Collin, who was two years old at the time of the investigation and not Nathan's biological son. The affidavit stated that the Department records indicated that Collin had sustained serious physical injuries and Erica and Nathan provided no plausible explanations for the injuries. Collin's biological father was named his permanent managing conservator and Erica no longer provides care for Collin.

The Department representative averred in her affidavit that the Department was requesting that it be named Cindy's temporary managing conservator because the Department "is worried about [Cindy]'s safety and well-being" and that it was the Department representative's belief "that due to [Cindy]'s level of vulnerability, she would be placed at substantial risk of harm" if Erica continued to provide her care.

Evidence and Findings at Trial

Testimony of Stephanie McGlory

Stephanie McGlory testified that she was the CPS caseworker for the case involving Cindy. McGlory testified that at the time of trial Cindy was placed with

4

Erica's sister, who was an elementary teacher in the area. According to McGlory, Cindy appeared to be "very well" taken care of by her aunt and adoption by Cindy's aunt would be in Cindy's best interest.

McGlory testified that concerns arose when Erica took one-month-old Cindy for a doctor's visit and Erica was slipping in and out of consciousness and was non-responsive. Although someone believed Erica may be suffering from a stroke, medical records indicated a stroke was ruled out and Erica admitted she had used synthetic marijuana. According to McGlory, this situation caused her to believe that Erica knowingly placed Cindy in conditions or surroundings which endangered Cindy's physical and emotional well-being and that Erica engaged in conduct which endangered Cindy's physical and emotional well-being. McGlory testified that Erica never acknowledged to her that she had used synthetic marijuana just prior to her admission to the hospital. McGlory testified that it greatly concerned her that Erica chose to conceive Cindy with Nathan when he was the person that CPS had determined was the alleged perpetrator of the physical abuse to Erica's older child, and that by doing so she placed Cindy in physical and emotional danger.

McGlory testified that although Erica complied with most of her service plan, Erica missed "quite a few" of her scheduled visits with Cindy. McGlory testified that there were also some concerns because at the visits she observed, it appeared Erica did not understand how to care for Cindy, and although Erica would talk to

5

Cindy, "it just wasn't much interaction." According to McGlory, Cindy's aunt and caregiver had concerns and reported to McGlory that at one visit Cindy was choking and Erica called to the aunt to handle the situation. In McGlory's opinion, Erica could not parent independently. McGlory testified that Erica attended her three sessions of the parent support group, allowed McGlory and the Court-Appointed Special Advocate (CASA) to come for visits on a regular basis, maintained employment at a retail store, and completed her drug and alcohol assessment. McGlory testified that Erica failed to comply with her court-ordered service plan in that she did not maintain independent housing, failed to get assistance for having been in a relationship with someone who was verbally abusive to her, was not honest with McGlory about her relationships, and did not follow through with recommendations after her psychological evaluation.

McGlory believed that Erica's parental rights as to Cindy should be terminated on endangerment grounds and because Erica failed to comply with her service plan, and McGlory believed that termination of Erica's parental rights was in Cindy's best interest.

On cross-examination, McGlory admitted that Erica passed every drug test that the Department required during the pendency of the case, that the Department is not in possession of any medical records wherein Erica was diagnosed with drug addiction or tested positive for any drug, and that the hospital records indicated that

6

Erica did not have any drugs in her system. McGlory also acknowledged that during the case Erica lived in a corner of her father's house, and although Erica told McGlory she pays her father rent, Erica never provided McGlory with a rent receipt.

McGlory testified that when Cindy came into the Department's care, Nathan did not have a relationship with Cindy and did not try to form a relationship. McGlory testified that Nathan suffers from schizophrenia and bipolar disorder and that in a prior CPS case Nathan was ordered not to be around Erica's son and Cindy's half-brother Collin because Nathan was suspected of physically abusing Collin. In McGlory's opinion, Nathan's past conduct towards Collin constituted a situation which would endanger Cindy's physical and emotional well-being and that Nathan had constructively abandoned Cindy in that he had not regularly maintained significant contact with Cindy or shown that he had a stable, secure, safe environment for Cindy. According to McGlory, Nathan remained away from Cindy for at least six months, had not visited with Cindy in the ten months prior to trial, and never provided items for Cindy. McGlory also testified that Nathan had made threats to his family, had been arrested in May for possession of Ecstasy, and at the time of trial had a warrant for his arrest.

Erica's Testimony

Erica testified that she lives in a dedicated space at her father's house and has paid him $200 a month in rent for the past two years. As for her service plan, Erica

7

acknowledged that she had not completed her counseling, she had not obtained independent living, and she missed three visits with Cindy due to a lack of transportation. According to Erica, she had maintained employment for a year at a retail store, completed her parenting classes and participated in the parent support group, submitted to a psychological evaluation with Dr. Amin and followed up with Spindletop, maintained contact with her caseworker throughout the case, passed all drug tests requested by the Department during the pendency of the case, and passed the drug test given by the hospital on December 10, 2019. Erica testified that her diagnosis after her evaluation at Spindletop was "adjustment disorder with depression[]" and counseling was recommended. Erica testified that she felt she benefited from her parenting classes and parent support group and understood her responsibility in providing Cindy a safe, stable environment and the importance of not using drugs or alcohol. Erica testified that she was in the process of moving into an apartment with a friend she met in 2010 at Job Corps and that she and Cindy would have their own room together. Erica explained that she knew this friend did not have a criminal or CPS history because she asked him.

Erica testified that she did not remember telling the hospital staff that she had taken synthetic marijuana but that her mother and her friend told her that when the hospital staff asked her that she admitted to it. According to Erica, her mother would not lie to her about what she heard, and Erica just did not remember telling anyone

8

about using synthetic marijuana. Erica testified that the hospital ruled out a stroke and told her that the cause of her episode was inconclusive. Erica testified that when she was admitted into the hospital her friend was there helping her care for Cindy.

Erica agreed that she had not been in a relationship with Nathan "for a pretty good while[.]" Erica testified that she conceived Cindy after Collin was removed from her care, that she loved Nathan when she had Cindy, and she admitted that she told Dr. Amin that she broke up with Nathan because she believed he hurt Collin. She also acknowledged that she told Dr. Amin that she had a long history of drug use before she had children, she last used drugs in 2017, and she last used synthetic marijuana in 2013.

Nathan's Testimony

Nathan agreed that Collin was placed in foster care and at the time he had black eyes and bruising on his head, and when he was asked if those injuries occurred while he was caring for Collin, Nathan testified that Erica "wasn't getting up off the couch[]" so he "decided to do it [him]self[]" and "let [Collin] throw his tantrum." Nathan admitted that he was made aware in the previous CPS case that his and Erica's explanation of what happened to Collin was not consistent with Collin's injuries.

Dr. Nisha Amin's Psychological Evaluation Report

A report by Dr. Nisha Amin of Erica's psychological evaluation was admitted into evidence. According to the report, the evaluation was conducted during the case and when Cindy was four months old. Erica denied using synthetic marijuana since 2013, stated that she broke up with Nathan because he lied about physically abusing her son, and Erica reported that Nathan had a history of drugs and a criminal record. Dr. Amin noted that Erica admitted that she also had a history of addiction to alcohol, which she claimed she quit "three months ago[,]" admitted a history of addiction to marijuana, which she claimed she quit in 2016, admitted a history of addiction to "Xtacy", "Mollies," and Codeine, which she claimed she quit in 2016, and admitted a history of addiction to synthetic marijuana, which she claimed she quit in 2013. Dr. Amin noted that Erica's "insight is intact but limited, in terms of understanding the impact of drug abuse and parental absentia on children[,]" and that Erica's "judgment is good for general concerns but limited in terms of parenting and child development." Included in Dr. Amin's diagnoses of Erica were bipolar disorder, generalized anxiety disorder, substance abuse disorder, and unspecified personality disorder. Dr. Amin also reported as follows:

> [Erica's] own sense of affection and bonding with her children has been impacted by her indiscriminate drug use, psychiatric problems, lack of parenting skills, lack of involvement, and lack of support. Furthermore, she admittedly has not been consistent with treatment in the past (and admittedly would not have sought out the treatment on her accord,

10

given her self-medication through drug abuse) and therefore on-going psychiatric treatment will be crucial.

. . . There is a concern about her ability to ensure she associates with appropriate individuals who will not endanger her children, e.g., her previous boyfriend who abused her older son.

Psychiatric supervision:
This young woman should benefit from psychopharmacological intervention. Regular evaluations should follow to ensure her psychological needs and developments are addressed.

Drug Use: On-going relapse prevention program, as well as regular drug screening, is also warranted given her history of drug use and relapse.

Reunification Concerns: Current data does not warrant significant concerns which would impede [Erica]'s daily functioning or her capacity to be an independent and effective parent, as long as she is able to show that she is a psychologically capable, socially competent, financially independent, sober, mature adult who is able to prioritize the welfare and safety of her children in all areas long-term.

The CASA Report

The report from the CASA in this case was admitted into evidence. The CASA stated in her report that Cindy appeared well adjusted in her current placement with her maternal aunt. The CASA observed visits between Erica and Cindy and stated in her report that Cindy "d[id] not seem to have a strong attachment to [Erica]." The CASA stated in her report that she believed that Cindy should remain with her maternal aunt who had provided Cindy with a stable environment in which she could grow. According to the CASA's report, the maternal aunt was willing to adopt Cindy, but not willing to be Cindy's permanent managing conservator because she

11

felt it would confuse Cindy by having Erica coming in and out of Cindy's life. The CASA's report stated that the CASA believed it was in Cindy's best interest to remain in her current placement.

Findings of the Trial Court

At the conclusion of the hearing, the trial court found that the Department had shown, by clear and convincing evidence, that it was in the best interest of Cindy to terminate Erica's parental rights. The trial court found that the Department had shown, by clear and convincing evidence, that Erica had knowingly allowed Cindy to remain in conditions that endangered her physical or emotional well-being and engaged in conduct or knowingly left Cindy with persons who engaged in conduct that endangered her physical or emotional well-being. The trial court also found that the Department had shown, by clear and convincing evidence, that Erica failed to comply with the provisions of a court order that specifically established the actions necessary for Erica to obtain the return of Cindy who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of Cindy's removal from her under Chapter 262 for the abuse or neglect of Cindy. The trial court terminated Erica's and Nathan's parental rights to Cindy.

12

## Issues

In her first appellate issue, Erica challenges the legal and factual sufficiency of the trial court's determination that termination of her parental rights is in Cindy's best interest. In issues two through four, Erica also challenges the legal and factual sufficiency of the trial court's findings under subsections 161.001(b)(1)(D), (E), and (O).

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder

13

could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (citing *In re J.L.*, 163 S.W.3d at 86-87).

Endangerment

Due process requires a heightened standard of review of a trial court's finding under subsections 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination, because of the potential consequences of the parent's parental rights to a different child. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). Under subsection D, parental rights may be terminated if clear and convincing

14

evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). We examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *Id.* (quoting *In re N.B.*, No.06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem.

15

op.)). The child does not have to suffer actual injury; it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.).

In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, incidents of domestic violence, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.).

According to Erica, the drug test at the hospital on the day she was admitted came back negative and "[she] did not intend for this episode to occur nor did [she] intend to place [Cindy] in a dangerous environment." Erica argues on appeal that

she passed every drug test required by the Department, testified that she has not taken illegal drugs since 2017, and testified that she has not used synthetic marijuana since 2013. Erica further argues that after Nathan physically abused Collin, she stopped dating Nathan and that they did not plan to have Cindy. Erica contends she has never been accused of causing physical harm to either of her children.

The Department presented the trial court with evidence that at the time of intervention by the Department, Erica told the hospital staff that she had used synthetic marijuana, at the time of her admission into the hospital Erica was slipping in and out of consciousness, and Erica was breastfeeding Cindy. The trial court heard evidence that Erica loved Nathan, Cindy's father, and Erica got pregnant with Cindy after Nathan had physically abused Erica's son. The trial court heard evidence of Erica's past pattern of drug and alcohol addiction. Dr. Amin's psychological evaluation of Erica noted that Erica's bonding with her children had been affected by her drug use, psychiatric problems, lack of parenting skills, lack of involvement, and lack of support, and that ongoing psychiatric treatment would be crucial. The report recommended psychopharmacological intervention, regular evaluations, and participation in anti-relapse programs, and the trial court heard the Department caseworker testify that Erica did not follow Dr. Amin's recommendations. Even though Dr. Amin recommended that she should take pharmacological medication, the trial court heard Erica testify that she chose not to take any medications for her

conditions because she said someone at Spindletop told her she did not need them. The trial court also heard the caseworker's testimony that Erica was not equipped to handle an episode where Cindy was choking and that Erica's episode at the hospital had endangered Cindy.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Erica, through her individual acts or omissions or a course of conduct, endangered Cindy's physical or emotional well-being. We conclude the Department established, by clear and convincing evidence, that Erica committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Erica endangered Cindy. *See In re J.F.C.*, 96 S.W.3d at 266.

We need not address the sufficiency of the evidence to support a violation of subsection O. *See In re D.S.,* 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights."). We overrule issues two and three, and we decline to address issue four.

18

Best Interest of the Child

Trial courts have wide latitude in determining a child's best interest. *See*

*Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong

presumption that the best interest of a child is served by keeping the child with her

parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528,

533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent

placement of the child in a safe environment is also presumed to be in the child's

best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in

determining whether a parent is willing and able to provide a safe environment for a

child. *Id.* § 263.307(b). There are several factors that may be considered when

determining whether termination of parental rights is in the best interest of the child,

including: (1) the desires of the child, (2) the emotional and physical needs of the

child now and in the future, (3) the emotional and physical danger to the child now

and in the future, (4) the parental abilities of the individuals seeking custody, (5) the

programs available to assist these individuals to promote the best interest of the

child, (6) the plans for the child by these individuals or by the agency seeking

custody, (7) the stability of the home or proposed placement, (8) the acts or

omissions of the parent that may indicate that the existing parent-child relationship

is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See*

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). Stability and permanence weigh heavily in considering a child's best interest. *See In re J.D.*, 436 S.W.3d at 119-20 (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)). Evidence of a recent turnaround by a parent may be considered by the factfinder but is not determinative. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A factfinder is not required to ignore a long history of harmful behaviors by a parent merely because the harmful behavior abates as trial approaches. *Id.* at 513.

20

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

Erica argues that she "loves [Cindy] and has done everything she possibly can to satisfy the enumerated factors under the *Holley* test to protect her constitutional right as a parent to not have her parental rights terminated." However, the trial court had evidence before it of Erica's past drug history, the limits of her parental abilities, her admission to the hospital reporting she had used synthetic marijuana, that Cindy is well adjusted in her current placement, that Erica had not completed her court-ordered service plan, that Erica had not followed up on the recommendations from Dr. Amin or received counseling after being in an abusive relationship, that at the

21

time of trial Erica still had not obtained independent stable housing, that the CASA believed Cindy's adoption by her aunt was in Cindy's best interest and Cindy was not very bonded to Erica, and that the Department caseworker believed termination of Erica's parental rights was in Cindy's best interest.

Deferring to the trial court's determination of the credibility of the testimony and other evidence, and in light of the entire record, we conclude that the evidence is legally sufficient to support the trial court's finding that terminating Erica's rights was in Cindy's best interest. *See id.* We overrule Erica's first issue challenging the best interest determination.

We affirm the trial court's order of termination.

AFFIRMED.

 

 

_____
LEANNE JOHNSON
Justice

Submitted on February 18, 2021
Opinion Delivered March 18, 2021

Before Golemon, C.J., Kreger and Johnson, JJ.